# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 23, 2014

## STATE OF TENNESSEE v. JAMAYL STOUDEMIRE

**Appeal from the Criminal Court for Hamilton County**
**No. 283801    Don W. Poole, Judge**

_____

**No. E2013-02054-CCA-R3-CD - Filed October 29, 2014**

_____

Defendant, Jamayl Stoudemire, was charged by indictment with three counts of attempted first degree premeditated murder (Counts One through Three), three counts of aggravated assault (Counts Four through Six), and employing a firearm during the commission of a dangerous felony (Count Seven).  Defendant entered a best interest plea of guilty to three counts of aggravated assault, a Class C felony, as charged in Counts Four, Five, and Six.  The remaining counts of the indictment were dismissed.  The parties agreed that the three counts would run concurrently with the trial court to determine length and manner of service.  At the sentencing hearing, the trial court sentenced Defendant to five years for each conviction of aggravated assault to be served concurrently in the Department of Correction as a Range I offender.  The trial court also denied Defendant's request to be placed on judicial diversion. Defendant raises two issues on appeal.  He argues that his five-year sentence is excessive and that the trial court should have ordered judicial diversion.  After a thorough review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Michael L. Acuff, Chattanooga, Tennessee, for the appellant, Jamayl Stoudemire.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; William H. Cox, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## Background

*Guilty Plea Submission Hearing*

The State presented the following factual basis for the trial court's acceptance of the guilty pleas:

> [O]n or about [October 28, 2011,] police were dispatched to the 2300 block of East 34[th] Street. Police observed two black females l[]ying in the street at 3012 Fifth Avenue, who had been shot. [A] [b]lack male was seen on the sidewalk in front of 3012, he had also been shot. Spoke with witnesses and they indicated that a group of young black males had, apparently there had been an altercation in that area, the house, between two young females. As a result, several young black males, including the defendant, came to the residence. At that point in time, the first interaction, [Defendant] produced a shotgun. They then left the scene, came back with more individuals. Many of those individuals, including [Defendant], were armed.
>
> At some point in time, there was a verbal altercation between the two groups of people. [Defendant] and his group began to leave the area and subsequently, according to the victims, turned around and opened up fire on some of these individuals, striking these three people I've just described, Vanessa Suttles, Veronica Suttles and Darrel Oneal Sims.
>
> Ms. Vanessa Suttles was taken to Erlanger with injuries to her hip, Ms. Veronica was taken with injuries to her wrist and Mr. Sims was taken with a grazing injury to his chest.
>
> Apparently the witnesses knew [Defendant] and his group, they were located at another residence in the area, and I don't have that address. Were located in a house in that area. Several other people, including [Defendant] were located in that house. SWAT arrived, eventually they left the house after some period of time. Recovered in the house was a .25 caliber handgun, that I don't believe had any relevance to this case, but there was a shotgun, the shotgun that witnesses described [Defendant] as possessing, that was found located inside the house, as well as shell casing cartridges and clothing that the witnesses described.

Those items were sent off to the TBI, there were shotgun shell casings recovered from the crime scene, where the shooting took place, those matched the shotgun shells recovered in the residence [Defendant] was located in.

There was also gunshot residue [test] performed on his clothing, that came back positive for gunshot residue on [Defendant]'s clothing.

No other weapons were recovered, there were other shell casings recovered from the crime scene, several .45 caliber shell casings were recovered from the crime scene, . . .[Defendant] gave a statement to the police in which he denied ever being there. The statement from the witnesses w[as] that this other group of people that the victims were in did not have any weapons, were not firing any weapons. It was described that the only people that had weapons were [Defendant] and his group of people. However, there were .45 [caliber] shell casings that were recovered in the area that the victims were in or had been in. So it could be argued, . . . that there was firing between the two respective groups.

Also, . . . there were projectiles recovered at the hospital from the victims. Those were not collected after the incident and they have since been destroyed by the hospital. So that's the reason for the disposition in this matter, those two reasons.

*Sentencing Hearing*

Defendant's presentence report was admitted into evidence without objection. According to the report, Defendant had the following juvenile adjudications of delinquency: theft under $500, vandalism, unruly behavior, disorderly conduct, four violations of probation, criminal trespassing, and assault. The report further reflected that Defendant reportedly began drinking alcohol when he was thirteen, that he began using marijuana when he was nine years old, and that he would use four "blunts" a day until 2008. He had also been placed in State custody.

Darrel Sims testified that he was at the home of Vanessa Suttles, his girlfriend's sister, on October 28, 2011. The house was located on Fifth Avenue. Defendant's girlfriend, Veronica Suttles, and Valorie Suttles were also present. Mr. Sims testified that he arrived at the house between 6:00 and 7:00 p.m. He said:

Well, my situation was I was getting off work and me and my girlfriend was going to get her son from her sister['s] house. And before all this , while this

was in the midst, I guess a girl fight happened, you know, so that's what happened before we even got there, we didn't even know that happened. So when we got there, they was outside talking about it, you know what I'm saying, so I arrived there, we had to go get some gas, then he was going to come back and get us, so while we waiting [sic] on him to get gas, I guess about six guys walked up. I still don't, I wouldn't know them to this day, you know, because I ain't never seen them before, you know. I mean they looked like little kids to me, so I didn't even think no threat over it, they got in a little argument, I was like my girlfriend and them will handle that, between they kids, you know, the little girl fight or whatever happened.

So, really, I thought it was about all over. Before I knew it, some shooting occurred, you know, a lot of shooting occurred. So I ran, ducked for cover, and in the mist of that, I got shot in the chest.

Mr. Sims testified that the shot fractured two of his ribs, and he was hospitalized approximately two days. He then lost his job at Pilgrim's Pride. Mr. Sims thought that the weapons used during the shooting were high caliber because of the distance from him to the shooters and because the bullet traveled in and out when it struck him.

Mr. Sims testified that there were approximately six girls and a boy with the Suttles' family whose ages ranged from thirteen to fifteen. They were standing approximately twenty feet from the group of males who were firing the shots. Mr. Sims testified that he ran away after the shooting began and that bullets were "coming everywhere" and covered the "whole street."

Mr. Sims testified that he did not get involved in the altercation before the shooting because he believed that the two groups would be able to resolve the dispute on their own. On cross-examination, Mr. Sims said that the situation became heated, and he watched as Vanessa Suttles attempted to separate the two groups in order to protect her own daughter. He testified that Vanessa Suttles' son was also trying to protect his sisters and cousins because he did not want them to get into a fight with the group of males. Mr. Sims testified that the two groups then separated, and he thought that the incident was over until he heard the gunshots.

Vanessa Suttles testified that she was living at 3102 Fifth Avenue on October 28, 2011, with seven children. She said that Defendant previously dated one of her daughters, Kishala. She also knew Mailik Phillips because he had visited her house on several occasions. Concerning the events that occurred on October 28, 2011, Vanessa Suttles testified:

-4-

I was going to take my daughter to a sleep over, so I left the house and we were going, probably had made it right to 23rd Street, and we received a phone call, it was [Defendant], he called and told her to tell my youngest daughter, which is Jakasia, to come outside because his girlfriend wanted to fight her. So I told Kishala to hang up the phone with him and call home and try to tell them not to open the door. I immediately turned around, turned the car around and headed back towards home.

By the time I got to my house, I didn't get a chance to pull in the driveway because the street was covered with kids and my daughter was out there. And I immediately jumped out [of] the car and took off running to find out where she was at and I was screaming break them up, don't let them fight, don't let them fight. And the fight took place, they fought.

Vanessa Suttles explained that her daughter and Defendant's girlfriend, "Doodie," were involved in the fight which took place at the corner of 31st and Fifth Avenue. She said that the fight took place because Defendant called her daughter out to fight.

Vanessa Suttles testified that the fight did not last very long because she pulled her daughter away from "Doodie." Ms. Suttles instructed Defendant and "Doodie" to leave. However, the parties continued arguing, and Ms. Suttles told her children to go home. Vanessa Suttles testified that Defendant got mad and pulled out a shotgun. Ms. Suttles asked him if he was going to shoot her. Defendant then pulled a second gun out of his jumpsuit. Jerry Springs, who was there with Defendant, told Defendant that he wanted his guns back, but Defendant refused. Ms. Suttles took her camera phone and pointed it in Defendant's face and told him that she was going to record him and show it to the police if he did not leave the area. She said that "Doodie" continued arguing and insisted on retrieving her jacket. Ms. Suttles gave the jacket back to her so that she had no reason to return. Defendant, "Doodie," and the others with them proceeded down the street.

Vanessa Suttles testified that she began videotaping them, and Mailik Phillips told her not to record him. She told Mr. Phillips that she would not show the recording to police if they continued walking and did not come back. Vanessa Suttles testified that Defendant's mother later pulled up, and Ms. Suttles told her everything that happened and that she was going to press charges against Defendant for instigating the fight between Jakasia and "Doodie" and for pulling the two guns on her and her family. Defendant's mother advised her to go ahead and press charges against Defendant. Ms. Suttles testified that Defendant's mother also indicated that she had "took out an attachment on him for, I'm guessing, running away."

Vanessa Suttles testified that after the conversation with Defendant's mother, she saw Defendant walking back toward her house with Mailik Phillips, Jerry Springs, Mr. Springs' mother, Savon Jones, Rayford Grayson, Jamayl Bell, and Jonathan Conyers. She said that Savon Jones was repeating, "where the n-----s at." Because she knew that Defendant was armed, Ms. Suttles immediately attempted to stand in front of her family as she tried to talk to Defendant and tell him that there were no boys fighting and that it was only a "girl fight." Ms. Suttles testified that her children began arguing with Defendant's group, but Defendant did not say anything. He only stared. Vanessa Suttles testified:

> And they started like hovering around him, the boys did, like protecting around him, so I'm getting my kids back. And after that, they just started shooting and took off and started backing back and started shooting like they was in the wild, wild west, you know.
>
> I got shot. Before I got shot, I tried to push my sister and my kids to run. I couldn't run because I had been hit and I told my sister to run because I couldn't run because I couldn't move anything below my waist, so I told them to run. My sister said she couldn't run because she had been shot too, and her boyfriend said I'm hit too. And I told them just lay there. And I started praying that we didn't die. And I just kept praying, had my head down, but in the midst, you could see they still shooting, they was shooting while they was running.

Vanessa Suttles testified that she saw Defendant fire the shotgun twice. He fired one shot into the air and one shot at her. She also saw Savon Jones with a handgun.

Vanessa Suttles testified that the group of people outside with her at the time of the shooting included her two daughters, Kishala and Jakasia Sparks, her nephew Christopher Suttles, Brianta Heath, Breanna Hammond, Breanna Buchanan, Valorie Suttles, Veronica Suttles, Stephanie Johnson, Maria Bragg, Courtney Puckett, her son Jerry Christopher, her goddaughter Tionna, and Darrel Sims. Vanessa Suttles further testified:

> Inside my house I had my seven-year-old, Antonasia, Antonasia Robinson, my granddaughter; Chloe Christopher, she's like a close friend of the family. She was like maybe six at the time. My great niece, Heather Leigh Johnson; my oldest daughter, Keirra Suttles, she's M.R., she's handicapped.

Ms. Suttles testified that the children in the house ranged from nine months old to ten years old.

Vanessa Suttles testified that she was shot in the abdomen and was in the hospital for three weeks. She was later re-hospitalized. Ms. Suttles had intestinal surgery, and she now has a metal plate in her hip. She was in a wheelchair for sixteen months, and she now uses a walker. Vanessa Suttles testified that her sister, Veronica Suttles, was shot in the hand. Vanessa Suttles testified that Defendant had ruined her life. She said:

> I have a mentally handicapped daughter that has now had, she's never been put on medication, and since this night she's now taking depression medication. She has trouble sleeping, she's withdrawn from a lot of things and I'm not able to abide by her like I used to due to this. And during this time, I was in [the] process of adopting my niece. Because of this, she can't speak to me. I lost my job, I was working every day. I was one week and four days from an annual and [I'm] not able to work to go to work on the job that I loved, because of this.

Patricia Stoudemire, Defendant's mother, testified that Defendant got into trouble as a youth and spent time in State custody. She said that if Defendant received probation, he would live with her at 3603 Fourth Avenue. Ms. Stoudemire also testified that she and her husband would attend family counseling with Defendant, and her husband agreed to help Defendant get a job on third shift at "Koch's." They also had plans for Defendant to "be at Chattanooga State for his high school diploma and at the same time, he'll be taking a trade." Ms. Stoudemire testified that she would provide transportation for Defendant. She also said that she had noticed a big change in Defendant's attitude, character, and personality over the past two years and that he realizes the seriousness of his situation.

On cross-examination, Ms. Stoudemire testified Defendant began getting into trouble when he was fourteen years old for "little minor stuff." She admitted that he was placed into State custody two times for four or five months each time. Although she could not remember the reason for Defendant being placed in state custody the first time, she said that the second time he was placed into state custody was for playing with water balloons or "something like that" on the last day of school. Ms. Stoudemire testified that Defendant had been released from state custody approximately 30 days before the present offenses. Defendant was living with her at the time of the offenses.

Ms. Stoudemire agreed that Defendant was adjudicated delinquent in December of 2007 for disorderly conduct and ordered not to raise his voice or his hands to his mother. However she denied that Defendant ever raised his voice to her or assaulted her. Ms. Stoudemire did not recall Defendant being adjudicated delinquent for assaulting Michael Vargas in September of 2008. She was notified when Defendant vandalized an elementary school in 2007. She did not know that Defendant provided a female's urine for a drug test

in 2010. Ms. Stoudemire was further unaware that Defendant was involved in resisting arrest in April of 2010 and that he had been smoking four "blunts" a day until his arrest in this case. Ms. Stoudemire denied that Defendant shot anyone on October 28, 2011.

Ms. Stoudemire testified that Defendant had an assault in November of 2011 after he was taken into custody for the present offense. She was unaware that Defendant was found guilty of throwing milk at a guard in March of 2013 while in custody. She knew that he was charged with assault and making threats and sexual proposals toward a guard in April of 2013. Ms. Stoudemire had "heard" that Defendant was previously discharged from a group home for fighting and gang-related behavior.

Cleveland Hobbie, III, is pastor of the New Life Seventh Day Adventist Church. He had known Defendant and his family since October of 2007. Mr. Hobbie testified that he had interaction with Defendant through youth meetings and workshops and that Defendant had spent the night at his home with other children. He said that Defendant had been involved in church "at the very highest level of young people involved, in Path Finders, a Christian version of the Scouts. Youth programs." Before the present offenses occurred, Defendant had been "very consistent" with the audio/visual ministry.

Mr. Hobbie testified that if Defendant were to be released on probation, Defendant needed "about two basic pieces to help him, in addition to his own plans for school and working, and that is acceptance and re-acclimation back to the family of God." He said that Defendant also needed "peaceful accountability" by remaining involved in the ministry. Mr. Hobbie testified that he would assist and make sure that Defendant had resources that he needed and would make certain that Defendant "follows the paces, keeping up, and a counseling standpoint, just to dialogue, help keep his head clear."

Defendant testified that he was seventeen years old at the time of the offenses, and he had been incarcerated since October 28, 2011. Defendant admitted that he had a gun at the time of the offense and that he fired the weapon. He said his intention was to "stop what was going on from going on." Defendant testified that he did not intend to shoot anyone.

Defendant testified that he instigated the initial fight between "Doodie" and Jakasia Sparks. He said: "Yeah, I called down there and told them, said, I told them like y'all need to squash the beef, because it was just on and on on [sic] Facebook and all that." Defendant testified that the two girls began fighting and ended up on the ground. After some of the parents arrived, he helped break up the fight and pulled out a gun because he was afraid that some of the others there were going to "gang" Doodie or beat her up. Defendant testified that there were approximately six people in his group and ten people in the other group. He

said that the fighting eventually stopped although the two groups continued to argue, and his group left for a period of time.

Defendant testified that Rayford Grayson later decided that the group should go back to the home of Vanessa Suttles to "squash the beef" or settle the dispute in a peaceful manner. They decided that Jerry Springer would talk to Vanessa Suttles because he was the oldest member of the group. Defendant testified that he was still armed with the gun, and he did not see anyone else with a gun. He said that as they approached Ms. Suttles' residence, she came out, and Mr. Springer ran away. Defendant testified that he told Ms. Suttles that they were not there to fight but to settle the dispute. However, Defendant said that Ms. Suttles indicated that there would be no talking as long as he was armed. Then everyone began arguing. Defendant claimed that Ms. Suttles' group was larger in number than his group and that they were armed with sticks and bricks. He said, "[S]o everybody just really arguing back and forth and they pushing us on down the street back down where we came from." Defendant testified that he was afraid and pulled his weapon out and fired it two times into the air. He said that he did not intend to shoot anyone.

Defendant testified that if released on probation, he would live with his mother, go to school to earn his GED, and he would pursue a career in civil engineering. He said that he had been attending church every Tuesday and Friday. He also apologized to Ms. Suttles.

On cross-examination, Defendant testified that he had the shotgun in his pants prior to the shooting. He said that he bought the gun from a Hispanic individual approximately two weeks prior to the shooting. He admitted that he would carry the weapon any time that he walked around the neighborhood.

Defendant testified that he never made threats toward Ms. Suttles while he was in custody. He admitted that his nickname is "Smiley" because he smiles a lot. Defendant identified a letter that he wrote to Mailik Phillips who was about to be released from jail. In the letter, Defendant told Mr. Phillips that when released, he wanted Mr. Phillips to "make something shake for me on these witnesses[.]" Defendant admitted that he was referring to Ms. Suttles and her children; however, he claimed that the statement was not a threat. He wanted Mr. Phillips to talk to the witnesses "[a]bout why it's going down like that, why they doing me like that, and they know I didn't do nothing."

Defendant admitted that he had previously pled guilty to the assault of Michael Vargas; however, he claimed that Mr. Vargas beat him up. Defendant further admitted that he had violated probation four times by getting in trouble at school and skipping school. He testified that he provided female urine for a drug test because he had been smoking marijuana.

Defendant testified that his father molested him when he was six years old, and his mother had been in jail at one time. He said that he had a prior anger problem and attended a class for anger management. Defendant denied throwing milk at a guard. He said that the charge of threats and sexual proposals to a female guard were due to the lyrics in a rap song that he was singing, and the guard overheard him. Defendant admitted that he had used marijuana daily from the age of nine until 2008. He testified that he had received and completed drug treatment in the past. Defendant testified that he was released from probation and DCS custody in September of 2011 rather than in October of 2011.

Investigator Kenneth Burnette, a crime scene investigator with the Chattanooga Police Department, testified that he was dispatched to the scene of the shooting on October 28, 2011. He photographed the scene and documented it with a 3D scanner. Investigator Burnette explained that the scanner "takes 50 something thousand pixels per second, [] as it spins around, you'll see a little green laser spinning around, it's documenting everything it sees while it's spinning a 360 degree angle."

Investigator Burnette testified that there were five Winchester .45 caliber auto shell casings and two shotgun shell casings found at the scene. He noted that the distance between the first shotgun shell casing and a blood spot in the road was one-hundred and forty-three feet, and the distance between the spot and the second shotgun shell casing was two-hundred and thirty feet. The distances from the .45 caliber shell casings were 39.8 feet, 41 feet plus, 71.3 feet, and 32.5 feet. On cross-examination, Investigator Burnette testified that the shell casings were collected by Investigator Salyers. Investigator Burnette did not know if the .45 caliber shell casings were already there before the shooting on October 28, 2011. They were found on the east side of Fifth Avenue. There was very little lighting in the area of the shooting.

**Analysis**

Defendant contends that the trial court erred in sentencing him. More specifically, he states that the trial court erred in imposing an effective five-year sentence to be served in confinement because the facts did not show that Defendant fired the shots that struck the victims, and therefore his conduct was not "horrifying, shocking, reprehensible, offensive and exaggerated." We disagree.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This standard of review

extends to alternative sentences as well. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012)("[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence."). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court imposes a sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

In considering Defendant's sentence, the trial court made the following extensive findings:

[Defendant] is a young man presently 19 years of age, birth date May 27, 1994, so he's now 19. At this time, he was under the age of 18. So he's a young man. He's single, no indication that he has any children.

He had pled guilty on June 24, 2013, to three counts of aggravated assault, class C felonies; such as, facing, as a Range I offender, three to six years in the Department of Correction[ ]. The more serious charges, three counts of attempt[ed] first degree murder, counts one two and three of that indictment, and then count seven, using a firearm in the commission of a felony, were dismissed at that time.

So before us for [sentencing] today are these three counts of aggravated assault. It's agreed that whatever happens, as far as sentencing, is these sentences will be concurrent, running at the same time. The law sets out guidelines to follow in regard to sentencing, as far as [Defendant] and all defendants are concerned, I follow that concerning [Defendant], set out in Tennessee Code Annotated 40-35-103. And I will mention different parts of that law as we talk about what the appropriate sentence is.

In regard to that, I consider the pleas that have been entered. [Defendant] has entered pleas to three counts, three class C felonies, best interest pleas, but certainly based upon the proof here today, there's ample proof of that. And I might say in regard to that, because this certainly can be considered, I think all would agree, and [Defendant] was well represented, that a jury, based upon the facts, could have found him guilty of a much more serious offense, based upon the facts that if the jury believed he shot into this crowd, he could, he was charged with assault with intent to commit first degree murder, certainly that was consideration, as well as assault with intent to commit second degree murder. So I consider the employees [sic] that were entered to aggravated assault.

I consider the, everything at this presentence investigative, or this presentence, well, I'm sorry, this sentencing hearing that has been conducted today. I've listened and taken notes and will consider all of that.

First, I consider the presentence investigation report that was in fact prepared and entered, the TBI eligibility report indicating that [Defendant] has no adult criminal record, as such is entitled, based upon these class C felonies, to consideration for diversion. And I'll talk about that in a second.

I consider Exhibit 3, which is a diagram of an area, and certainly the diagrams and the charts and so forth that was presented by Detective Burnette.

I consider the testimony of Darrel Sims, one of the victims of an aggravated assault, which was under count six of the indictment and his injuries.

And I consider the testimony of Vanessa Suttles, and I think she was a credible, very credible witness, describing her injuries as to what happened on this evening, and what she saw [Defendant] do on this evening. And, as indicated, I think very credible, and certainly based upon the proof we've heard, injuries that she sustained are horrible and she will live with those injuries for the rest of her life.

I consider the testimony of Patricia Stoudemire, the mother of [Defendant], this defendant, and she will provide a home for him and has been there for him. And certainly the testimony of pastor Cleveland Hobbie, he gives all of us some guidelines as to maybe how a lot of young people could stay out of trouble: Go to school, get a job, go to work, accept responsibility for your actions. And he would hope, I guess, that [Defendant], in the future, would do

-12-

all of those things. And I would hope that he would. Because no matter what happens today, he still can in fact do that.

I don't have the power to sentence him enough that's going to put him away for any extended time that would keep him from doing any of those things, so I would hope that he would listen in the future to Pastor Hobbie and what he advises concerning that.

I consider the testimony of [], this defendant, and, [Defendant], I would hope somewhere down the road, five or six or seven or eight years, if you tell me something, I'd believe you. But right now, I don't. I don't think you're a very credible witness as far as what you tell me, and judges have to make those decisions. And I'll tell you, but I would hope sometime in the future that you can convince me that when you look me in the eye, you're telling me something, I would hope that you're saying, well, you're telling me the truth.

You know, I still can't figure out why anybody went over to Ms. Suttles' home that night, just doesn't make any sense to me; went over there so this girlfriend could settle up with this girlfriend, and when I went, I took a shotgun. Actually, Ms. Suttles says she saw you with possibly another gun on that occasion, but, admittedly, you had the shotgun when you went over there so one girlfriend could settle up with the other girlfriend. That, to me, is not smart, not smart at all.

And based upon that fight, I guess all of us would hope that that's all it had been was a fight and guns weren't involved, but guns were involved and serious injuries resulted from it. So, hopefully, down the road, you tell me something, I'll believe you; right now, I don't. I don't believe what you say about what happened.

I read this, another exhibit that I consider is the exhibit that, from apparently to this defendant, Phillips, in the jail. And certainly somebody could read that letter and take that as a threatening later, that in regard to witnesses outside, if Mr. Phillips, my young buddy, gets out of jail, it could be a threat. So that letter is in the file.

And then, finally, Detective Burnette, who has presented proof that Mr. Acuff put on, and I understand, I understand that proof that's been presented as to where shotgun shells were found, where .45 caliber shells, were found, where bloodstains were found, and I consider all of that.

So all of this at the sentencing hearing, I consider. As indicated, the presence investigation report, which is in the record, and I have in my notes, and I think it's probably true, [Defendant] would probably agree, horrible juvenile record. And not all of that's school related, it's just, it's a horrible record.

I will say this, there are no felonies, Mr. Acuff, as you argue, and so they are not criminal convictions that can be considered in regard to enhancing factors.

I put in my notes that he was out of DCS custody for a month, but now, he's corrected me. I believe that. Apparently the paperwork didn't get out, but he had been out for some time when this occurred.

All of us would hope, sincerely hope, that people go into any kind of custody, that you never get in trouble again. You know, we work on these things, a little of this, a little of that, and hope that young people will follow that and say, look, I don't want to go to jail, I don't want to go to the penitentiary, I want to change my life around.

I listened to, I think well presented from the State of Tennessee and from [Defendant], the lawyers, as they present their arguments for sentencing alternatives. Mr. Acuff argues strenuously for alternative sentencing, probation, argues certainly that [Defendant's] been locked up now for almost two years. And Mr. Williams argues just as strongly that [Defendant] should go to the Department of Correction[ ].

The nature and characteristics of the criminal conduct involved, I look at that. Horrible, horrible facts. Taking a shotgun over there while two girl friends argue. Having an argument, going away and coming back again. Horrible facts. And certainly at a jury trial, arguably, premeditation at that point when somebody does that. I don't have to determine range, as both lawyers know. A judge normally has to determine that range.

No question that [Defendant] is a Range I offender, has no felony background at all, even in juvenile court, couldn't consider that anyway unless it was a felony, but he's a Range I offender, such, as indicated, he's facing three to six years.

Mitigating and enhancing factors. In the presence investigative report, it mentions age or youth or he lacks substantial judgment, I don't find that to be

true.  [Defendant] is 17 years of age and taking a shotgun and/or gun over in this fight, I think he would have known better than that.  So I don't find that youth or his youthfulness caused this to happen or he lacked judgment.  I don't find that to be true.

Now, I do find, and I think it's sad that [Defendant] said well, this is a normal life.  [Defendant], you haven't had the benefit of some things that other youngsters have had, and I do find that you had a difficult childhood.  In the presentence report, it says that some of the times you went to juvenile court, your mother was in jail.  That's not normal.

Mainly, though, and I don't know anything serious about being in jail, but just wasn't there.  Of the assault by your father and criminal behavior there, I do think that you had a difficult time growing up.  You're a man now, or at least in this court you're a man, so people overcome things like[] that every day.  Bad times, bad things that happen to them, you can overcome up.  So I consider that one mitigating factor.

Enhancing factor is, though, he has no criminal convictions at all, as far as anything that can be considered, but he does have criminal behavior and constantly being in trouble and using drugs, that's criminal behavior, repeatedly using those drugs.  So number one is there as far as an enhancement factor.

Number eight, he has been given probation on multiple occasions.  It sets out in the presentence report that in almost all of those occasions he's violated the conditions of his probation, so I think that there.

Number ten says no hesitation about committing a crime when the risk to human life is high.  It does apply to these victims.  I think I find that to be true because it appears to me that you shot into a crowd of people, so there were other people in the age [sic] of danger, so I think that enhancing factor is in fact there.

The office in Nashville puts out statistics about what happens with people, young people who get in trouble, I consider those, that statistical information.

Any statement made by [], the [Defendant].  And, [Defendant], I've told you that, and I hope somewhere down the road you can tell me something and I believe you, but I do consider the statement that you've made today in court,

about what you thought happened and what you say happened; once again, I don't find that, at this point, to be very credible. Hopefully, in the future, I will.

His potential for rehabilitation. When I say this, it looks like I'm putting a kiss of death on [Defendant], because, but that's one of the factors I have to look at, and, quite frankly, if you look at everything that's happened in juvenile court, if you look at dropping out of school, being suspended from school, and all these things, at least the potential is not there, but you can, you can rehabilitate yourself, but I don't find right now that it's very great.

So I consider all of those things in regard to setting a sentence, and we'll do that momentarily. But, now, there is another issue before the Court and that is in regard to judicial diversion, as to whether or not if he got a probative sentence that this should be held over his head from a period of time and then dismissed and erased from the record.

\*     \*     \*

It says, the law says that if the sentence is less than ten years, then he's eligible for probation. If it's a class C felony, he's considered a favorable candidate for alternative sentencing. I do think, based upon the facts and circumstances and everything that I've heard, that this, in this situation is inappropriate, but let's go over to confinement.

And I think the thing that sticks out in my mind is confinement is necessary to avoid depreciating the seriousness of the offense or particularly suited to provide an effective deterrent to another. Now, the law goes further and says that something must be horrifying, shocking, reprehensible, offensive, I think, or exaggerated, I think all of these things are present here. I think taking this loaded shotgun over to referee a fight, to disappear and come back again and to fire this weapon into the crowd are [sic] directly at these victims is all of those things, it's horrifying, it's shocking, it's reprehensible, it's offensive, it's exaggerated, so I think that alternative sentencing, I think that probation, neither of those is appropriate based upon those factors and that factor.

*Length of Sentence*

We note that even a trial court's misapplication of an enhancing or mitigating factor in passing sentence will not remove the presumption of reasonableness from its sentencing

-16-

determination. *Bise*, 380 S.W.3d at 709. Here, as enhancement factors, the trial court found that Defendant had a history of criminal behavior; that before trial or sentencing, Defendant failed to comply with the conditions of a sentence involving release into the community; and that Defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (8), and (10). Defendant correctly argues, and the State concedes that application of enhancement factor (1) was inappropriately applied to the offenses because Defendant's daily use of marijuana as proof of criminal behavior occurred while Defendant was a minor. *See State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001)(enhancement factor one applies necessarily to adult criminal conduct, and enhancement factor sixteen applies exclusively to juvenile adjudications of delinquent acts). However, enhancement factors eight and ten were appropriately applied. The trial court properly sentenced Defendant to five years for each offense, which was within the applicable range of punishment of three to six years.

### *Denial of Probation*

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code. Ann. § 40-35-210(b).

Our sentencing law provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(5), (6). Additionally, a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. *Id*. § 40-35-102(6)(D). We note that "the determination of whether the [defendant] is entitled to an alternative sentence and whether the [defendant] is entitled to full probation are different inquiries." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing his or her suitability for full probation, even if the defendant should be considered a favorable candidate for alternative sentencing. T.C.A. § 40-35-303(b); *Boggs*, 932 S.W.2d at 477. In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical

and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether incarceration is appropriate, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant....

T.C.A. § 40-35-103(1); *see also State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

Defendant was an eligible candidate for probation. *See* T.C.A. § 40-35-102(6)(A). He was also considered a favorable candidate for full probation. Tenn. Code Ann. §§ 39-14-105(5); 40-35-102(6)(A).

Here, the trial court did not abuse its discretion in denying probation. The trial court, as recited above, denied probation essentially based on Defendant's lack of potential for rehabilitation and the nature and circumstances of the offenses. The trial court found confinement to be necessary to avoid depreciating the seriousness of the offenses. Defendant's juvenile record consists of the following juvenile adjudications of delinquency: theft under $500, vandalism, unruly behavior, disorderly conduct, four violations of probation, criminal trespassing, and assault. The presentence report reflected that Defendant reportedly began drinking alcohol when he was thirteen, that he began using marijuana when he was nine years old, and that he would use four "blunts" a day until 2008. He had also been placed in State custody on two occasions. In 2010, Defendant provided female urine for a drug test because he had been smoking marijuana. He was also on probation for a juvenile offense when he committed the present offenses. The trial court specifically found that it did not find Defendant credible concerning the circumstances of the offenses, which involved Defendant firing his shotgun into a crowd of people that included numerous children wounding three people. Vanessa Suttles testified that she was shot in the abdomen and was in the hospital for three weeks. She was later re-hospitalized. Ms. Suttles had intestinal surgery, and she now has a metal plate in her hip. She was in a wheelchair for sixteen months, and she now uses a walker. Ms. Suttles testified that Defendant ruined her life. This issue is without merit.

*Denial of Judicial Diversion*

Judicial diversion, as provided for by our General Assembly in Tennessee Code Annotated section 40-35-313 for Defendant's offense which occurred in 2010, allowed the trial court to defer further proceedings against a "qualified defendant" after a guilty plea or conviction, and place the defendant on probation without entry of a judgment of guilty. Successful completion of probation would lead to dismissal of the charge and expungement of all public criminal records. Tenn. Code Ann. § 40-35-313(a)(1)(A), (2), and (b). (2010 Rplc.). A "qualified defendant" at the time of Defendant's offense was defined as a defendant who

> (a) Is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
>
> (b) Is not seeking deferral of further proceedings for a sexual offense, a violation of § 71-6-117 or § 71-6-119, or a Class A or Class B felony; and
>
> (c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i).

The appellate standard of review of a trial court's decision to grant or deny judicial diversion is abuse of discretion accompanied by a presumption of reasonableness, when the trial court considers the common law factors set forth in *State v. Electroplating, Inc.*, 990 S.W.2d 211 (Tenn. Crim. App. 1998) and *State v. Parker*, 932 S.W.2d 945 (Tenn. Crim. App. 1996), places on the record the reasons for granting or denying judicial diversion, and specifically identifies the relevant common law factors. *State v. King*, 432 S.W.3d 316, 327 (Tenn. 2014). The trial court is not required to recite each *Parker* and *Electroplating* factor, but the record should reflect the trial court considered all the factors and identified factors that are applicable to the case under consideration. So long as there is any substantial evidence to support the trial court's decision to grant or deny judicial diversion when the trial court has complied with this procedure, the trial court must be affirmed. *Id*. The common law factors are:

> (1) the defendant's amenability to correction
>
> (2) circumstances of the offense

(3)    the defendant's criminal record

(4)    the defendant's social history

(5)    the defendant's physical and mental health

(6)    the deterrence value to the defendant as well as to others

(7)    will judicial diversion serve the ends of justice to both the defendant
       and the public

*State v. King*,  432  S.W.3d at 326.

As to these seven factors the trial court made the following findings in addition to those sentencing findings quoted above:

There are cases, [*State v. Parker*, 932 S.W.2d 945 (Tenn. Crim. App. 1996) and *State v. Electroplating, Inc*. 990 S.W.2d 211 (Tenn. Crim. App. 1998)], that [set] forth factors which I have to consider in determining whether [Defendant] is a suitable candidate for judicial diversion. His amenability for correction, not very good.  Repeatedly tried at probation, dropped out of school, so I find that factor very much against him.

The circumstances of the offense I find very much against him because I think this is an aggravated offense, of shooting at people and shooting three people, the circumstances of the offense, this factor, is against the granting of judicial diversion.

His criminal record, based upon his adult record he would be entitled to judicial diversion, had no record at all, as far as a criminal court is concerned, at his age, when this happened.  I don't give a great deal of weight to that, but it would be in his favor.

His social history is not good, he has used drugs, he's been repeatedly in trouble, he's had these problems in his home life, so the social history, as far as granting judicial diversion, is against him.  His physical and mental health is against him to the extent that he does have some mental health issues that he can work with and correct, as far as anger, as far as other things that are in the presentence investigative report, I find that against him.  The deterrence value to the defendant and others I think is against him.  Whether judicial diversion

-20-

will serve the ends of justice, I find that's against him because I think it will not.  So judicial diversion is not a proper consideration in this case.  It's a consideration, but I don't think it's proper that he be granted it.

Considering our supreme court's holding in *King*, we conclude that the trial court met the requirements in this case in order for its decision to be entitled to the standard of review of an abuse of discretion with a presumption of reasonableness.  Accordingly, we conclude that the trial court did not err by denying judicial diversion.  Defendant is not entitled to relief in this appeal.

The judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE